## UNITED STATES DISTRICT COURT FOR
## THE MIDDLE DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MOUNTAINVIEW THOROUGHBRED RACING ASSOCIATION, LLC, D/B/A HOLLYWOOD CASINO AT PENN NATIONAL RACE COURSE,<br><br>    Plaintiff,<br><br>    v.<br><br>PENNSYLVANIA GAMING CONTROL BOARD and TOM WOLF, GOVERNOR OF PENNSYLVANIA, in his official capacity,<br><br>    Defendants. | Civil Action No.:<br><br>(Electronically Filed) |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

In October 2017, the Pennsylvania General Assembly passed radical and sweeping amendments to the Pennsylvania Race Horse Development and Gaming Act, 4 Pa. C.S. §§ 1101 *et seq.* (the "Gaming Act"). In a whirlwind 24-hour period, both the Senate and the House passed the 939-page amended Gaming Act, known as "Act 42" or "House Bill 271." There was no meaningful consideration of Act 42. There was no debate in the Senate, and a scant few hours of debate in the House. In fact, many legislators complained they did not even have the time to read the bill before voting on it. There also was no assessment of Act 42's fiscal impact distributed before the vote. As a result, there was no way to determine

whether the Act could accomplish its stated purpose of raising $225 million in new gaming revenue. Many legislators and observers raised serious doubts that the bill could achieve this purpose, for a key feature of the Act—up to 10 new casinos with anywhere from 300 to 750 slot machines each—will not lead to new gambling revenues, but instead will divert the same income streams away from existing casinos. The Assembly referred to this concern as "cannibalization," and protecting the revenue of existing casinos was another ostensible purpose of the Act.

Undeterred, the Assembly hastily passed Act 42 on October 26, 2017, and Governor Wolf signed the bill into law four days later. This was a rush to legislate and will cause significant and unique material harm to one Pennsylvania casino: the Plaintiff, Mountainview Thoroughbred Racing Association, LLC, d/b/a Hollywood Casino at Penn National Race Course ("Plaintiff" or "Mountainview"). The harm flows from the Act's misguided attempt to curb the "cannibalization" risk by establishing 25-mile buffer zones around existing casinos like Hollywood Casino. Instead of preventing "cannibalization," Act 42 actually encourages the cannibalization of Hollywood Casino. Though the 25-mile buffer zones purport to treat all existing casinos equally, as applied, Hollywood Casino, uniquely situated in the middle of the state, is the *only* casino likely to face significant cannibalization from new Category 4 casinos. Because most of Hollywood

2

Casino's customers travel from beyond 25 miles to come to its casino, the 25-mile protective zone does not capture the majority of its customers.  Furthermore, overlapping buffer zones surrounding existing casinos in the eastern and western thirds of Pennsylvania, render those portions of the state—and the population centers, including the greater Philadelphia, Pittsburgh, Lehigh Valley, and Scranton–Wilkes-Barre areas, they encompass—almost entirely off-limits to Category 4 casinos, leaving the vast majority of sites for Category 4 casinos in the central portion of Pennsylvania, encircling Hollywood Casino.  Legislators and Governor Wolf knew the Act would have a unique, disparate, and adverse impact on Hollywood Casino as compared with all other existing Pennsylvania casinos, but went ahead with passing the Act anyway, without adding any measures that might prevent cannibalization of Hollywood Casino's customer base and revenues. There was no rational basis for this arbitrary and inequitable treatment of Plaintiff, which violated Plaintiff's constitutional rights in multiple ways.  Plaintiff therefore brings this complaint for declaratory and injunctive relief against the Defendants in their official capacities to prevent the unconstitutional implementation of various provisions of Act 42.

**OVERVIEW**

1.      Pennsylvania's Act 42 of 2017, signed into law by Governor Wolf on October 30, 2017, is a wide-reaching gaming expansion bill that authorizes a panoply of new regulated gaming options in the Commonwealth.

2.      The passage of Act 42 in Pennsylvania is part of a broad trend.  In recent years, state officials have attempted to address pressing budget problems through expedient, shortsighted measures, rather than by reducing spending or raising sales or income taxes.  The revenue anticipated from gaming expansion purportedly was needed to fill a budget gap after the Commonwealth received a downgrade in its credit rating and the General Assembly and the Governor received harsh and widespread criticism from the public and the press for failing to balance the budget for the current fiscal year.

3.      Proponents claim that Act 42's gaming expansion programs will generate at least $200 million in revenue from licensing fees in the current fiscal year and increased gaming tax revenue in future years.  These projections are at best speculative and possibly illusory.  In fact, there was no study made available to legislators prior to passage of the Act to assess the Act's fiscal impact.

4.      Act 42 was enacted by the Pennsylvania General Assembly in a whirlwind twenty-four-hour period and signed into law by Governor Wolf just four days later, without meaningful consideration and debate by the legislature, public

vetting, or any study as to how the many new forms of gaming might impact existing Pennsylvania casinos.  Indeed, multiple legislators complained that they did not even have an opportunity to read the 939-page, highly technical bill prior to voting for its approval, despite making specific requests for additional time to review the bill.

5.    While minimal gaming expansion had been considered and debated by the General Assembly in the past, Act 42 was shocking in the breadth and scope of the new forms of gaming it authorizes, including fantasy contests, iLottery, interactive gaming, airport gaming, sports wagering, casino simulcasting, video gaming at truck stops, and the introduction of an entirely new class of casino full-service facilities.

6.    One new form of gambling authorized in the Act is the establishment in Pennsylvania of 10 new casino facilities, termed "Category 4" licenses, which will have up to 750 slot machines and 30 table games each.  These new Category 4 casinos are often misleadingly referred to as "satellite," "ancillary," or "mini" casinos despite having the statutory authorization to be larger than some casinos on the Las Vegas strip.  In addition, Category 4 casinos can be larger than existing Category 3 casinos, which currently have up to 600 slot machines each.  The locations of these new casino facilities will be auctioned off by the Pennsylvania Gaming Control Board ("the PGCB") beginning on January 10, 2018.

7.    The 10 new casino facilities will operate in competition with Pennsylvania's 12 existing brick and mortar casino facilities, which currently generate $1.4 billion in tax revenue for the Commonwealth each year.

8.    The Act's gaming expansion scheme is expressly intended to generate additional revenue for the Commonwealth and to prevent cannibalization of revenue generated by the 12 existing Pennsylvania casinos.  To that end, the Act provides for a protective zone around each existing casino facility, requiring that each new "Category 4 location," defined within Act 42 as a specific geographic point with a 15-linear mile radius, be at least 25 miles away from established casino facilities (unless the new Category 4 facility has the same owner as the existing casino).

9.    Plaintiff's Hollywood Casino is the only casino located in sparsely populated central Pennsylvania.  As a result, Plaintiff is the only existing casino operator in Pennsylvania whose operations will be dramatically affected by the new Category 4 casinos.

10.    Overlapping protective zones surrounding the multiple casinos in the Philadelphia, Lehigh Valley, and Scranton–Wilkes-Barre areas create a "mega cluster" protective zone that extends 127 miles longitudinally by 76 miles latitudinally.  This has the practical effect of extending protections to the seven eastern casinos far beyond the 25-mile radius contemplated in the Act and

essentially blocks the *entire* eastern third of Pennsylvania from entry by a Category 4 casino.

11.    Further, a last-minute addition to Act 42 by Sen. Mario Scavello provided special treatment for another of the twelve existing casinos, Mount Airy Casino Resort ("Mount Airy") in Mt. Pocono, by barring the development of a Category 4 casino in three counties—Wayne, Pike, and Carbon—adjacent to Mount Airy's home county of Monroe.  These additional statutory protections dramatically expand Mount Airy's 25-mile protective zone, making it nearly three times larger than any other casino's protective zone.  The special treatment afforded to Mount Airy shows that the 25-mile protective zone alone is insufficient to protect some of Pennsylvania's existing casinos from cannibalization and that Act 42's drafters recognized these insufficiencies.  The special treatment of Mount Airy was designed to guarantee that Mount Airy will remain the closest and most convenient Pennsylvania casino facility for gambling patrons traveling from the New York City metropolitan area.

12.    As a result of the eastern "mega cluster," together with Mount Airy's special protective zone, virtually none of the 10 available Category 4 casinos can be located in roughly the eastern third of Pennsylvania.

13.    As applied, the Act's protective zone provision creates another "mega cluster" in the southwestern part of Pennsylvania, encompassing the greater

Pittsburgh area, where the 25-mile radii surrounding the three existing casinos there create an expanded protective zone as wide as 95 miles by 72 miles and covering almost the entire southwestern corner of the state.

14.     As a result of the southwestern "mega cluster," virtually none of the 10 available Category 4 casinos can be located in roughly the southwestern part of Pennsylvania.

15.     The eastern and southwestern "mega clusters" encompass the most densely populated areas of Pennsylvania, generally leaving only more sparsely populated areas in the central portion of the state available as potential sites for a Category 4 casino.  Those areas surround Hollywood Casino *on all sides*.

16.    The following map shows the protective zones, the mega clusters

created by those zones, and the special treatment afforded to Mount Airy:



Note:  Distances are approximate.

17.    Hollywood Casino is the only existing Pennsylvania casino that will

have a protective zone of only 25 miles in all directions.[1]  Because the majority of

---

[1]    Presque Isle Downs, located in Erie, is the only other casino outside of a mega cluster, but it borders Ohio and New York and, upon information and belief, it draws a significant number of number of patrons from those states. Presque Isle Downs is effectively shielded from competition from Category 4 casinos along its north, western, and eastern sides by Lake Erie, Ohio, and New York, respectively.  Initial gaming revenue modeling suggests that Presque Isle Downs will not face anywhere near the cannibalization rates that are projected for Hollywood Casino.

Hollywood Casino's customers travel farther than 25 miles to visit the casino, the 25-mile protective zone will have little protective effect for Hollywood Casino.

18.    Legislators and Governor Wolf were made aware that, by its terms, Act 42 created the eastern and southwestern mega clusters and that those mega clusters in practice bar operators from opening a Category 4 casino in the state's population centers, including the greater Philadelphia, Pittsburgh, Lehigh Valley, and Scranton–Wilkes-Barre areas.

19.    Legislators and Governor Wolf also were made aware that the vast majority of the remaining available sites for Category 4 casinos surround Hollywood Casino, that Hollywood Casino's customers travel from beyond 25 miles to visit the casino, and that the Act provides a disparate protective zone of only 25 miles in all directions around Hollywood Casino that will be wholly inadequate to protect Plaintiff's $350 million investment, its 1,000-plus employees, its business relationships with suppliers and service providers, and the significant and ongoing contributions it makes to its host communities in East Hanover Township and Dauphin County and to Pennsylvania.

20.    There is no rational basis for permitting every other casino in Pennsylvania to enjoy protections from cannibalization by Category 4 casinos while leaving Plaintiff's Hollywood Casino uniquely vulnerable to cannibalization.

21.   The mega cluster protective zones also permit the existing licensees who enjoy the protection of those mega cluster zones to bid for new Category 4 casinos in the central portion of Pennsylvania, without concern about cannibalizing revenue from their own casino facilities, because they will be stealing market share from Hollywood Casino, not from their existing facilities.

22.   The intentional adverse and disparate treatment of Hollywood Casino is contrary to a core purpose of Act 42:  to protect existing casinos from market cannibalization.

23.   The intentional adverse and disparate treatment of Hollywood Casino also directly contradicts Act 42's revenue-generating goal, since Category 4 casinos cannot be located in the most populous portions of Pennsylvania, and Category 4 casinos surrounding Hollywood Casino will succeed only by cannibalizing some portion of Hollywood Casino's revenue stream.

24.   The intentional adverse and disparate treatment of Plaintiff and the favoritism shown to the Pennsylvania casino operators who benefit from the mega clusters and the operator of Mount Airy, which has its own special protective zone, is arbitrary, capricious, and wholly irrational and violates Plaintiff's rights under the United States and Pennsylvania Constitutions, including its right to equal protection and due process and the ban on Special Legislation that favors a private party.

25.     Plaintiff therefore seeks an order declaring the Category 4 license

program in Act 42, including 4 Pa. C.S. §§ 1305.1 and 1305.2, unconstitutional as

applied to Plaintiff insofar as it fails to provide Plaintiff with an adequate

protective zone against cannibalization with equivalent effect to the protective

zones afforded to casino operators in the mega clusters in eastern or southwestern

Pennsylvania or Mount Airy and thereby discriminates against Plaintiff and/or

treats Plaintiff as a class of one in violation of its rights under the United States

Constitution and the Pennsylvania Constitution, including its right to equal

protection and due process, and the ban on Special Legislation that favors a private

party.[2]

## JURISDICTION AND VENUE

26.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  Plaintiff's

claims arise under the Equal Protection and Due Process Clauses of the Fourteenth

Amendment to the Constitution of the United States and seek to invalidate certain

---

[2]     Mountainview, like all other Category 1 and 2 casinos, is currently
evaluating whether and to what extent to participate in the auctions for
Category 4 casinos beginning on January 10, 2018, in order to, among other
things, protect itself from cannibalization of revenue at its Hollywood
Casino and attempt to mitigate some of the damage from cannibalization.
Should Mountainview decide to participate in the Category 4 auctions, such
conduct is in no way intended to serve as a concession that the Category 4
program is constitutional as applied to Mountainview and does not waive
Mountainview's rights to challenge the constitutionality of Act 42.

Pennsylvania statutory provisions under the authority of the federal Supremacy Clause. This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, and the Civil Rights Act, 42 U.S.C. § 1983.

27. This Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over Plaintiff's claims for violations of the equal protection and due process guarantees, as well as the Special Legislation provision, of the Pennsylvania Constitution.

28. Venue is proper in this Court under 28 U.S.C. § 1391(b)(1)–(2). The Defendants are considered to reside in the Middle District of Pennsylvania because they perform their official duties in Harrisburg, Pennsylvania. 28 U.S.C. § 1391(b); *Taylor v. White*, 132 F.R.D. 636, 640 (E.D. Pa. 1990). In addition, a substantial portion of the events giving rise to Plaintiff's claims occurred in the Middle District of Pennsylvania. 28 U.S.C. § 1391(b)(2).

## THE PARTIES

29. Plaintiff Mountainview Thoroughbred Racing Association, LLC, d/b/a Hollywood Casino at Penn National Race Course, is a Pennsylvania limited liability company that operates Hollywood Casino at Penn National Race Course in Grantville, Pennsylvania.

13

30.    Defendant Tom Wolf, Governor of Pennsylvania, is sued in his official capacity pursuant to his duty to faithfully execute the laws of Pennsylvania under Article IV § 2 of the Pennsylvania Constitution.

31.    Defendant Pennsylvania Gaming Control Board ("the PGCB") is an administrative agency established by the Gaming Act, specifically 4 Pa. C.S. § 1201, and which has "general and sole regulatory authority over the conduct of gaming and related activities" as set forth in the Gaming Act.  4 Pa. C.S. § 1202(a).  The PGCB consists of three members appointed by the Governor and four members appointed by the House and Senate leadership. 4 Pa. C.S. § 1201(b).

## THE 2004 GAMING ACT

32.    Pennsylvania's General Assembly passed the Pennsylvania Race Horse Development and Gaming Act (the "Gaming Act"), 4 Pa. C.S. § 1101 *et seq.*, in 2004, which, among other things, provided for legalized slot machine gaming within the Commonwealth for the first time.

33.    Objectives of the Gaming Act included providing a significant source of income to the Commonwealth for tax relief; enhancing live horse racing and breeding programs, entertainment, and employment within the Commonwealth; providing broad economic opportunities to Pennsylvania's citizens; and developing tourism, while at the same time establishing a framework for strictly regulating and

14

monitoring licensing of gaming activity, protecting the public interests of the citizens of the Commonwealth, and monitoring the social effects of gaming.

34.     Pursuant to the Gaming Act, anyone seeking to operate a casino in Pennsylvania needs a license from the PGCB.  The Gaming Act provided for a limited number of casino licenses within the Commonwealth, which were divided into three categories:  Category 1 licenses permitting up to seven qualifying licensed horse racetracks to maintain slot machine facilities; Category 2 licenses permitting up to five stand-alone slot machine locations in metropolitan or other tourism areas; and Category 3 licenses permitting up to two hotel–resort slot machine facilities.  4 Pa. C.S. §§ 1301–1307.

35.     Category 1 and 2 slot machine licensees paid a fee of $50 million each to operate a minimum of 1,500 slot machines and as many as 5,000 slot machines. 4 Pa. C.S. §§1209, 1210.  Category 3 licensees paid a fee of $5 million each to operate up to 600 slot machines.

36.     The multimillion-dollar licensing fees were paid by licensees in addition to the millions of dollars in costs of developing, building, and fitting out their brick and mortar casino facilities.

37.     The Gaming Act as initially enacted allowed for slot machine gambling only.  It was later amended in 2010 to add table games to the available offerings at Pennsylvania casinos.  Category 1, 2, and 3 licensees paid an

15

additional fee, ranging from $7.5 million to $25 million, for a certificate to operate table games at their facilities.  4 Pa. C.S. §§ 13A11, 13A61.

38.    To protect the existing casinos' significant investments in licenses and facilities, the 2004 Gaming Act allowed existing casinos to recover some or all of their licensing fees should the number of licensed casinos increase in the future. *See* 4 Pa. C.S. § 1209(f).  This additional protection expired in 2014.

39.    Under the 2004 Gaming Act, slot machines were subject to a tax rate of 54% of revenue.  Of those taxes, 34% goes to property tax relief, 11% goes to the horse racing industry, 5% goes to the Economic Development and Tourism Fund, and 4% goes to local and county governments.

40.    Under the 2004 Gaming Act, as amended in 2010 to permit offering of table games, table games were subject to a 16% tax of revenue.  Of those taxes, 14% goes to the Commonwealth's General Fund and 2% to local and county governments.

## THE EXISTING CASINOS

41.    Following the passage of the Gaming Act, the first casinos opened in Pennsylvania in 2006.

42.    Today, Pennsylvania has 12 casino facilities, which are operated pursuant to licenses issued by the PGCB.

43.    Six casinos are located at horse racing facilities (Category 1 licenses), four are full-service stand-alone casinos (Category 2 licenses), and two are hotel–resort casinos (Category 3 licenses).

44.    The majority of Pennsylvania's existing casino facilities are located in one of two clusters in the densely-populated eastern and southwestern corridors of Pennsylvania.  Sands Casino Resort (Bethlehem), Parx Casino (Bensalem Township), Valley Forge Casino Resort (Upper Merion Township), Harrah's Philadelphia Casino and Racetrack (Chester), SugarHouse Casino (Philadelphia), Mohegan Sun Casino (Wilkes-Barre), and Mount Airy Casino (Mt. Pocono) are located in eastern Pennsylvania.  Rivers Casino (Pittsburgh), Meadows Racetrack & Casino (North Strabane Township), and Lady Luck Casino Nemacolin (Wharton Township) are located in Pennsylvania's southwestern corner.  The PGCB has also awarded a license for an additional Category 2 casino to be built in South Philadelphia, which is generally referred to as the Stadium Casino.

45.    Plaintiff's Hollywood Casino is the only existing casino located in the more sparsely-populated central region of Pennsylvania.  Given its more rural location, Hollywood Casino draws most of its patrons from areas more than 25 miles away.

17

46.     Pennsylvania's 12 existing casinos consistently generate more than $1.4 billion per year in tax revenue for the Commonwealth and their host communities.

47.     Since opening in 2006, Pennsylvania's 12 existing casinos have generated more than $11 billion in tax revenue for the Commonwealth.

48.     According to the American Gaming Association, Pennsylvania's existing casinos raise more gross revenue than casinos in any other state except Nevada.  Pennsylvania is also the number one state in tax revenue received from the casino industry.

49.     In addition to gaming-specific tax revenue, Pennsylvania casinos, as well as the hundreds of specialist suppliers that service the gaming industry in Pennsylvania, pay property, wage, and other corporate taxes.

50.     Pennsylvania casinos also employ a significant number of Pennsylvania residents.  As of June 30, 2017, the 12 existing Pennsylvania casinos employed over 17,000 workers.  In addition, Pennsylvania casinos have driven job creation and boosted revenues for small businesses in Pennsylvania communities through direct and many more indirect impacts.

51.     The PGCB has publicly acknowledged that Pennsylvania's existing casino landscape has "produce[d] tremendous benefits for Commonwealth citizens," including by "improving the quality of life in local communities,

reinvigorating [the Commonwealth's] horse racing industry, and lowering the property tax of homeowners."  Pa. Gaming Control Bd., *Gaming Benefits for Pennsylvanians*, http://gamingcontrolboard.pa.gov/?p=52.

52.    Before passage of the Act 42, gaming industry experts routinely touted Pennsylvania as a model gaming state.  *See, e.g.*, Gaming USA Corporation, *The Successful Investor's Guide to the Gaming Industry* 11(2018 ed. Dec. 18, 2017) ("New York and Pennsylvania had been states that we felt were doing things the right way, model gaming states for a while.").  Among other reasons, Pennsylvania's gaming model was praised for the number of licenses made available, the locations selected for gaming facilities, and its revenue structure.

### PLAINTIFF'S HOLLYWOOD CASINO

53.    Hollywood Casino opened in February 2008 as a 365,000-square-foot venue in the community of Grantville, Dauphin County, Pennsylvania, joining the Penn National Race Course thoroughbred racetrack that had been operating at the site since 1972.

54.    Hollywood Casino was one of the first casinos to open in Pennsylvania.  Plaintiff's upgrade of Grantville's standalone thoroughbred racetrack into a combined racino successfully incorporated gaming into the racing atmosphere, consistent with the 2004 Gaming Act's legislative goal of enhancing Pennsylvania's live horse racing and breeding programs.

55.     Mountainview holds a Category 1 slot machine and table games licenses for its Hollywood Casino.

56.     Since opening, Mountainview has continuously maintained its slot machine and table games licenses in good standing and has met all of its legal and regulatory obligations in connection with gaming activity in Pennsylvania on a continuing basis.

57.     Mountainview has invested over $350 million in its Grantville casino to date.

58.     Today, Mountainview operates more than 2,300 slot and video poker machines, 55 table games, a 17-table poker room, and 3 hybrid electronic table games at Hollywood Casino.  Additional amenities offered at Hollywood Casino include 11 bars and restaurants and live music.

59.     Because Hollywood Casino is located in a relatively rural area, more than two-thirds of its customers travel from beyond 25 miles to visit the casino.

60.     Since Hollywood Casino opened for business through November 30, 2017, Mountainview has paid over $969 million in taxes (excluding initial licensing fees) to the Commonwealth and $332.7 million in purse money to the owners of racing horses.

61.     In the same time period, Mountainview has contributed over $142 million in local share assessment payments to East Hanover Township and

Dauphin County. The municipalities have used these funds for various important projects, including local debt reduction, road and infrastructure projects, new ambulances, and park improvements.

62. In addition to the local share payments, Mountainview pays property taxes on its Grantville racetrack and casino facility. In 2017, East Hanover Township and Lower Dauphin School District are due to collect a combined $4.9 million in property taxes from Mountainview.

63. Hollywood Casino also generates significant tax revenues for the Commonwealth from its operations, including income, sales and excise, and business taxes.

64. Still, Hollywood is not among the most successful of the Pennsylvania casinos. Hollywood's 2016 gross revenues of approximately $245 million put it in the bottom half of Pennsylvania's 12 casino properties.

65. As of June 30, 2017, Hollywood Casino employed over 1,000 individuals.

66. In addition to its racing and gaming operations, Mountainview makes annual renovations to its gambling and racing facilities, which amount to about $2 million in output expenditures and dozens of additional jobs annually.

67. Mountainview does extensive business with other Pennsylvania businesses, including vendors, entertainers, and small businesses, as well as the

horse racing community, in connection with supporting the ongoing operations at Hollywood Casino, which amounts to approximately $8.9 million annually.

68.   Mountainview has made a positive impact on Pennsylvania and its local community in numerous other ways.  For instance, Mountainview donates approximately $3.5 million annually to Penn State University's Milton S. Hersey Medical Center and an additional $1.25 million annually to various other charities.

## THE PENNSYLVANIA BUDGET DEFICIT

69.   Pennsylvania has suffered an ongoing structural budget imbalance dating back nearly a decade, as well as a history of late budget adoption.  Rather than cut spending or increase taxes, Pennsylvania legislators recently have looked to short-term solutions to the budget deficits.

70.   Act 42 follows the recent broader trend among state officials to solve pressing budget problems through measures other than cutting spending or increasing taxes.

71.   The Commonwealth's $32 billion spending plan for the 2017–2018 fiscal year, which begins on July 1, was approved by the House and Senate in June 2017 without a revenue package addressing the $2.2 billion deficit needed to balance the budget.  The plan included a three percent spending increase over the prior fiscal year.

22

72.    The spending plan also did not address a $1.5 billion shortfall that remained from the prior fiscal year.

73.    In early Summer 2017, credit rating agencies warned of a bond rating downgrade for the Commonwealth if legislators did not come up with a revenue plan to balance the state budget in a timely manner.  Standard and Poor's Global Ratings put Pennsylvania on its negative "credit watch" list owing to the state's "eroding financial position and [Standard and Poor's] view that there is a significant likelihood that the [C]ommonwealth will not enact a structurally balanced budget for fiscal 2018."  Jason Gottesman, *S&P Downgrades PA Credit Outlook As Revenue Scramble Continues*, City & State Pennsylvania (July 6, 2017).

74.    To address the budget deficit, the General Assembly and Governor Wolf did not increase taxes or reduce spending.  Instead, they decided to radically expand gaming options and raise the tax rates on existing brick and mortar casino facilities.  They publicly stated that the gaming expansion would generate $225 million in taxes and licensing fees.  But the Assembly had no way of knowing whether it would or not, for there was no study conducted about the bill's fiscal impact before the final vote.

## PASSAGE OF ACT 42 OF 2017

75.    After the General Assembly passed the October 2017 revenue package for the 2017–2018 fiscal year, which expressly contemplated significant revenue from gaming expansion, the General Assembly hastily conceived and enacted Act 42 of 2017 to put the expansion into effect.

76.    Act 42 was enacted from House Bill 271.

77.    House Bill 271 is 939 pages in total, containing approximately 500 pages of substance, with roughly 400 pages of stricken language.

78.    House Bill 271 was introduced for the first time and voted on by the House and the Senate in a period of roughly 24 hours.

79.    House Bill 271 passed in the Senate on October 25, 2017.  There was no debate on House Bill 271 held in the Senate prior to passage of the Bill.

80.    House Bill 271, in its final form, was presented to House members for the first time late in the evening on November 27, 2017, at 9:40 PM.

81.    The Bill's sponsors, including its primary sponsor, Rep. Jason Ortitay, tried to hold the vote on the Bill that same evening in the one-hour-and-twenty-minute window before the 11:00 PM deadline for debate and vote set forth in House procedural rules.

82. Numerous members of the House protested that all House members had just received the Bill for the first time that evening and had not had any opportunity to read—much less meaningfully consider—the 939-page bill.

83. Specifically, Rep. Paul Schemel stated, "[T]his is a 939-page bill that we have just received. Now earlier tonight in debate we were told by the Majority Appropriations Chair that we already have all of the revenue passes we need to close this year's budget. That's the 2017–2018 budget. We have more than ample time to review this bill at length. We don't need to do it at 9–9:30 at night. We have time to review this and make an educated decision as to what is on it."

84. Rep. Scott A. Petri, the Chair of the Gaming Oversight Committee, also complained that he had never before seen the Bill and did not have any opportunity to read it: "You know, there was a famous American who led a particular congressional body who said, 'Let's vote on a bill and then we'll read it later.' Well, that's exactly where we are because . . . even as Chairman of the Gaming Oversight Committee, I have not had a chance to read the bill."

85. Reps. Robert Freeman and Dom Costa, among others, asked that the vote be delayed on the ground that the Bill "has not been in the public domain for our citizens, constituents to look at and to analyze and to consider and there are so many different moving parts to this legislation that it is difficult in the short span of time upon which we're being asked to consider this bill to do justice to knowing

how those implications of those moving parts will affect so many other aspects of the finances of the state and the impacts on our communities."

86.    Rep. Gene DiGirolamo made a motion to refer the Bill to the Gaming Oversight Committee for review and to hold a public hearing.  Others noted that the Gaming Oversight Committee had never before considered certain new forms of gambling authorized under House Bill 271, such as video game terminals at truck stops.  The motion to refer the Bill to the Gaming Oversight Committee was vetoed.

87.    Ultimately, because debate extended until the 11:00 PM deadline, the clock ran out and the House could not hold a vote until the next morning.

88.    Members were given overnight (from 11:00 PM to 8:00 AM the following morning) to review the Bill, which contained a number of detailed, highly technical gaming procedures; amended and referenced the existing Gaming Act; and dealt with a number of new forms of gaming.

89.    When debate continued at 8:00 AM the next morning, Rep. Mark Rozzi took the floor and asked several questions about the protective zones intended to protect existing Pennsylvania casinos from harmful effects of the new satellite casinos.

90.    First, Rep. Rozzi referenced maps that were distributed to legislators showing the 25-mile radius protective zones around existing Pennsylvania casinos.

26

Specifically, he observed the "mega cluster" effect of the protective zone provision that was clearly depicted on the map: "When I looked at the overlapping zones that they are set up, the 25 mile radius, to me in the map when I look at the map, and you look at the eastern side of the state, a lot of those casinos are overlapping. And if you look at the western side of the state, a lot of them overlap."

91.    Rep. Rozzi observed that the Bill intentionally targeted Hollywood Casino for adverse, disparate treatment.  Specifically, he stated that Hollywood Casino is the "only casino in the mid state that will have a full 25-mile radius around it" and nothing more in terms of protection from cannibalization.  He then asked the House Speaker, Mike Turzai:  "[W]hy is Hollywood Casino being singled out for discriminatory treatment and hurtful disparate impact under this amendment as opposed to the other existing casinos in the Commonwealth that will enjoy the mega-sized exclusion zones?"

92.    Rep. Rozzi also reacted to an unexplainable anomaly in the special treatment of a single casino in the Bill:  "I saw in the bill that there was a special carve out for the casino in Mount Airy.  Do you know why that was done?  Why there was a special carve out just for one casino?"  House Speaker Turzai responded that he "c[ould]n't speak to other people's motivations."

93.    Tellingly, Rep. Rozzi observed that it was unfair for Mount Airy to receive additional protection where Hollywood Casino did not, and noted that this

27

amendment did "not afford Hollywood Casino equal protection and fair treatment with respect to inclusion zones."

94.     Rep. Rozzi's concerns about the adverse, disparate impact on Hollywood Casino and blatant favoritism shown to Mount Airy were quickly dismissed, without further inquiry or consideration by House members.

95.     House Bill 271 passed in the House that same morning with a vote of 109 to 72.

96.     The Bill was presented to Governor Wolf on October 26, 2017.  He signed the Bill into law four days later, on October 30, 2017.

97.     No fiscal note was distributed to legislators prior to the Senate and House votes on House Bill 271.  Fiscal notes are bill analyses, prepared by the Governor's Budget Office, to explain the fiscal impact of bills being considered by the General Assembly and for use by the Governor's Office, the General Assembly, and the public.

98.     House Bill 271 was not made available to Pennsylvania citizens for public review and consideration for any meaningful period of time prior to the House and Senate votes.

99.     House Bill 271 was never submitted to the House Gaming Oversight Committee for review and comment prior to the House and Senate votes.

100.    Numerous articles, editorials, and letters to the editor have been published in respected Pennsylvania news sources criticizing Act 42 as ill-conceived.  *See, e.g.*, Letter to the Editor, *Elected Officials Cater to Gaming Interests, Again*, Penn Live (Dec. 18, 2017) ("Once again, elected officials, in a stealthy, heinous, eighteen-hour move catered to gambling interests.  They have expanded gambling everyone in Pa. with no public hearings and with no public input.  This was not done to benefit the citizens.  It was a revenue grab with no consideration of the cost side."); Op-Ed, *Pa. Gambling Expansion Is a Losing Bet*, The Philadelphia Inquirer (Nov. 15, 2017) ("Expanding gaming does not answer any public demand for more venues to gamble.  In fact, the cannibalization of existing casinos is almost sure to put a dent in overall revenue collection. . . .  This has to be one of the most massive examples of political incompetence in history."); Op-Ed, *Gambling Is a Bad Bet to Fix Pennsylvania's Budget*, LNP (Oct. 30, 2017) ("Every time we've counted on gambling in the budget those revenues have undershot it or something unexpected has happened, such as the decrease of the lottery fund in response to the expansion of table games." (quoting Rep. Bryan Cutler)); Op-Ed, *A Bad Bet: Expanded Gambling Is No State Budget Solution*, Pittsburgh Post-Gazette (July 14, 2017) ("There are many dubious aspects to this expansion of legalized gambling.  How do you set up satellite sites without robbing business from the existing casinos?  Is there truly a market that has not already

29

been reached?  How can you guarantee the estimated revenue when past revenue has not met expectations?").

101.   Industry experts have likewise admonished Act. 42.  *See, e.g.*, Gaming USA Corporation, *The Successful Investor's Guide to the Gaming Industry*  9 (2018 ed. Dec. 18, 2017) ("The gambling expansion bill that passed in Pennsylvania late in 2017 will most likely go down in history as the worst piece of gambling legislature ever . . . ."); *id.* at  10 ("[W]e don't believe the state will generate anywhere near what they hoped for while at the same time, they run the risk of damaging a casino business which, while mature, was still one of the better ones in the United States.").

## THE ACT 42 CATEGORY 4 LICENSE PROGRAM

102.   Among other new gambling initiatives, Act 42 provides for a new category of slot machine licenses, termed "Category 4 licenses."

103.   The Act allows for up to 10 Category 4 casinos within the Commonwealth.  Each Category 4 casino must have between 300 and 750 slot machines, and initially may have up to 30 table games. 4 Pa. C.S. § 1305.1(d)(1).

104.   These new Category 4 casinos, often misleadingly called "satellite," "ancillary," or "mini" casinos, can in fact be as large as or larger than the full-sized casinos on the Las Vegas strip.  For example, Tropicana Las Vegas has a 50,000 square foot gaming floor with 671 slots and 35 tables.  In addition, Category 4

casinos can be larger than Pennsylvania's existing Category 3 facilities, which currently have up to 600 slot machines each.  It therefore is inaccurate to call or refer to the Category 4 casinos as "satellite," "ancillary, or "mini" casinos; they are instead full-blown casinos.

105.   Licenses for the new Category 4 facilities will be auctioned off by the PGCB.  Under the Act, the first round of auctions must begin no later than January 15, 2018, and conclude by July 31, 2018.  4 Pa. C.S. § 1305.2(a)(1).

106.   If any of the 10 available licenses remain after the first round of auctions, subsequent auctions must be completed by August 31, 2018.  4 Pa. C.S. § 1305.2(b).

107.   Upon winning an auction, the Winning Bidder must select the location at which it intends to operate its Category 4 casino, effectively reserving that "Category 4 location."[3]  4 Pa. C.S. § 1305.2(c)(9).  Each Winning Bidder then has

---

[3]   Plaintiff has filed a separate lawsuit in in the Commonwealth Court of Pennsylvania seeking a limited declaratory judgment interpreting where the newly created Category 4 facilities may be located under Act 42.  *See Mountainview Thoroughbred Racing Assoc. v. Pa. Gaming Control Bd.*, No. 1-MD-2018 (Pa. Commw. Ct. 2018).  A "Category 4 location" is defined with its own 15-linear mile radius buffer zone to prevent Category 4 clustering, and Plaintiff seeks a declaration, consistent with the plain language of the Act, that a Category 4 location's buffer zone cannot overlap with the 25-mile protective zone around existing casino facilities.  The lawsuit also seeks a declaration, again consistent with the plain language of the Act, as well as its legislative history and statutory intent and the business and auction practicalities, that a Category 4 Licensed Facility must be

six months to submit a license application to the PGCB for the Category 4 license. 4 Pa. C.S. § 1305.2(c)(10).

## CANNIBALIZATION CONCERNS AND THE PROPOSED SOLUTION: <u>PROTECTIVE ZONES</u>

108.   The General Assembly and Governor Wolf knew the introduction of 10 new brick and mortar casinos threatens the revenue streams and ultimately the viability of Pennsylvania's 12 existing casino facilities.  This risk was termed "cannibalization" by Act 42's drafters.

109.   The purpose of Act 42 and the creation of Category 4 facilities is to increase tax revenue to the Commonwealth.  The Act will generate additional revenue only if the new casinos add more tax revenue than is lost by, or "cannibalized" from, existing casinos.

110.   Thus, to generate additional bottom-line revenue for the Commonwealth, the new casinos must attract new gamblers or cause existing patrons to gamble more.

111.   Recent history and empirical analysis demonstrate that additional casinos in Pennsylvania are unlikely to increase aggregate gambling revenue in the Commonwealth.

---

located at the center point of the Category 4 Location's 15-linear mile radius circle.

32

112. For example, a 2012 study found aggregate gambling revenue in the

Philadelphia-Northern Delaware-Atlantic City market *decreased* with the

introduction of Pennsylvania gambling venues:

> In sum, the regression suggests a ***negative and significant impact*** of Southeastern Pennsylvania slots and tables on the total revenue in the Southeastern Pennsylvania-Northern Delaware-Atlantic City marketplace.
>
> . . .
>
> [T]here is evidence that, as a region, ***gambling may fall as a result of overexpansion in the marketplace***. For states/regions that are considering the expansion [or] introduction of gambling, the results suggest that ***gambling revenues are not without limit.***[4]

113. Similarly, a 2014 study commissioned by the Commonwealth's

Legislative Budget and Finance Committee concluded that "Pennsylvania is nearly

fully built out and at the same time is surrounded by gaming states."  Econsult

Sols., *The Current Condition and Future Viability of Casino Gaming in

Pennsylvania*, at 65 (May 2014).  The Committee noted that new casinos in or near

Pennsylvania would pose "most of the threat" to the existing casinos, which largely

draw patrons from their local markets, and in some cases, the revenue impact of

new Pennsylvania casinos could be "significant."  *Id.* at 103.

---

[4]    Simon Condliffe, *Pennsylvania Casinos' Cannibalization of Regional Gambling Revenues*, 16 UNLV Gaming Res. & Rev. J. 1, 45–58, *available at* http://digitalscholarship.unlv.edu/grrj/vol16/iss1/3.

114.   With 12 existing casinos and 2 unopened casinos already planned in Pennsylvania (i.e., Stadium Casino in South Philadelphia and one additional Category 1 racetrack casino license that has not yet been issued), the Commonwealth's gambling market is mature and well-served.

115.   Despite authorizing many new forms of gaming, Act 42 expressly recognizes as a "public policy purpose[]"and declares "the intent of the General Assembly to:  (i) auction Category 4 locations and the right to apply for Category 4 locations in the Commonwealth to ensure the sustainability and competitiveness of the commercial gaming industry [and] (ii) authorize Category 4 locations in a manner to avoid cannibalization of existing commercial gaming locations."
4 Pa. C.S. § 1102(12.5).

116.   Governor Wolf has expressed concern about cannibalization of existing casino facilities on a number of occasions.  For instance, Governor Wolf's spokesperson J.J. Abbott stated publicly that "[t]he governor's biggest concern [in connection with gambling expansion] is not cannibalizing the Lottery or existing casino revenue that could jeopardize jobs."  Governor Wolf himself said that "the goal has been all along to do what's prudent, not cannibalize existing gambling revenue coming to the state."

117.   Despite Governor Wolf's express and legitimate concerns about cannibalization, statements of legislative intent to avoid cannibalization, and

34

requests by existing Pennsylvania casino operators that such a study or analysis be undertaken, no study or analysis whatsoever of the potential effects of the full complement of new gaming programs on existing Pennsylvania casino facilities was obtained or commissioned by the General Assembly, the Governor, or any other Pennsylvania agency prior to voting on House Bill 271.

118.   By contrast, in 2014 the Legislative Budget and Finance Committee issued a detailed study of the future viability of existing casinos should some forms of new gaming enter the local Pennsylvania markets.  *See generally The Current Condition of Future Viability of Casino Gaming in Pennsylvania*, *supra* ¶ 113.  In the rush to legislate, the Committee did not conduct a similar analysis in 2017.

119.   Before the General Assembly passed the House Bill 271, earlier gambling expansion bills required a market study of the Commonwealth before any new casino licenses were awarded in order to site the new casinos in locations that best fit the existing market.  The General Assembly did not include any such language in House Bill 271.

120.   Instead, the Act requires the PGCB to begin studying and issuing annual reports to the General Assembly's standing committee regarding any cannibalization from Category 4 casinos on the state's existing casino facilities only *after* Category 4 casinos are introduced into the Pennsylvania casino market.  Initial reports are due one year after the effective date of the Act.  4 Pa. C.S.

35

§ 1211(d.3). By then, it will be too late. The new casinos will be up and running, and it will be impossible to undo the harm they have caused.

121. In fact, Act 42 is silent as to what, if anything, the General Assembly can or should do if an after-the-fact study finds existing casino revenues have been cannibalized.

122. The Act expressly bars an existing casino from reducing its operations or its gaming footprint if it does experience a downturn in business owing to competition from Category 4 casinos. Specifically, the Act states "[a] slot machine licensee may not reduce the number of slot machines and table games in operation at a Category 1, Category 2 or Category 3 licensed facility, as of the effective date of this section, unless the board approves of a reduction and the reduction is not a result of the conduct of gaming at a Category 4 licensed facility." 4 Pa. C.S. § 1305.1(d)(4). Thus, casinos experiencing cannibalization from the introduction of Category 4 casinos are left without some potential avenues of recourse for preventing further harm to their business.

## ACT 42'S PROTECTIVE ZONES

123. Act 42 provides that "[a] winning bidder's Category 4 location may not be within 25 linear miles of another Category 1, Category 2 or Category 3 licensed facility but may be within 25 linear miles of the winning bidder's licensed

36

facility." 4 Pa. C.S. § 1305.1(b)(2). These zones are intended to protect existing casinos facilities from cannibalization.

124. As applied, the 25-mile protective zone provision creates a "mega cluster" protective swath around the seven existing casinos along the eastern edge of the Commonwealth (Mohegan, Mount Airy, Sands, Parx, Valley Forge, Sugarhouse, and Harrah's), which enjoy a 127-mile-long protective zone running from north to south, and a 76-mile-long protective area running from east to west; no Category 4 casino may be built anywhere in this area. *See* Map, *supra* ¶ 16. This means no Category 4 casino may be built in roughly the eastern third of Pennsylvania.

125. In addition, five of the seven existing eastern casinos (Sands, Parx, Valley Forge, Sugarhouse, and Harrah's) have no threat of a Category 4 casino along their eastern edge because their protective areas extend to the Delaware River/New Jersey border.

126. Rivers, Meadows, and Nemacolin enjoy a similar "mega cluster" in the southwestern part of Pennsylvania. Act 42 has the effect of creating a 70 to 95-mile-long protective area running from north to south and a 72 to 85-mile long protective area running from east to west. *See* Map, *supra* ¶ 16. Again, no Category 4 casino may be built in this area, which encompasses much of the western third of Pennsylvania.

37

127.   With the eastern and western thirds of Pennsylvania largely unavailable for the siting of Category 4 casinos owing to the mega cluster protective zones created by the Act, the vast majority of the remaining sites available for development of Category 4 casinos are in the central portion of the state, areas which surround Hollywood Casino.

128.   There is no rational basis for blocking the most populous areas of the state, with the largest numbers of potential casino patrons, including the Philadelphia, Pittsburgh, Lehigh Valley, and Scranton–Wilkes-Barre markets, from entry of Category 4 casinos, thus generally leaving only the central portion of Pennsylvania available for the siting of not just one or two but rather *ten* new casinos.  These siting restrictions are inconsistent with Act 42's stated principal purpose of generating additional gambling revenue for the Commonwealth.

129.   In comparison to the 127-mile by 76-mile protective zone enjoyed by casinos in the east and 95-mile by 72-mile protective zone enjoyed by casinos in the west, Plaintiff's Hollywood Casino receives only 25 miles of protection in all directions.

130.   The 25 mile protective area around Hollywood Casino, however, does not protect it from cannibalization of its revenue.

131.   Owing to the rural area where Hollywood Casino is located, more than 50% of its gaming patrons travel from well beyond a 25-mile radius from the

casino facility.  The 25-mile protective zone around Hollywood Casino covers largely rural areas, including upper Dauphin and Perry counties, and therefore the protective zone captures very few of Hollywood Casino's customers.

132.   The 25-mile protective zone provision, as applied, disparately impacts Plaintiff, because Hollywood Casino is the only existing Pennsylvania casino that is left with a 25-mile protective zone in all directions, while nearly every other casino in the Commonwealth would enjoy protective areas of 50 miles or more.

133.   The protective zone provision, as applied, further disparately impacts Plaintiff, because by almost entirely blocking the eastern and southwestern portions of Pennsylvania from entry of a Category 4 casino, the available sites for the placement of a Category 4 casino surround Hollywood Casino.

134.   The mega cluster protective zones created by Act 42 render it unlikely that existing licensees will develop Category 4 casinos in the eastern and southwestern parts of Pennsylvania.

135.   The mega cluster protective zones permit the existing licensees who enjoy the protection of those mega cluster zones to bid for new Category 4 casinos in the central portion of Pennsylvania, without concern about cannibalizing revenue from their own casino facilities, because they will be stealing market share from Hollywood Casino, not from their existing facilities.  It is therefore unlikely that casino operators in the eastern and southwestern parts of the Commonwealth,

39

whose casinos are presently protected from new entry by the mega clusters, will cannibalize themselves or compete with each other by adding Category 4 facilities within their own respective 25-mile buffers, when the obvious play is to locate their new Category 4 facilities in areas that are proximate to Hollywood Casino.

136.   Legislators and Governor Wolf's office were well aware of the adverse and disparate impact of the introduction of Category 4 casinos on Hollywood Casino.  When a prior proposal of "ancillary" casino legislation was circulating with the same 25-mile protective zone provision as the provision in Act 42, Plaintiff's representatives wrote to and met with numerous members of the Pennsylvania Senate and House of Representatives and representatives from Governor Wolf's office to explain the impact on Hollywood Casino.  In addition, Plaintiff circulated a white paper entitled "The Disparate Impact of the Ancillary Casino Proposal on Hollywood Casino at Penn National Race Course," which explained in detail the impact on Hollywood Casino and the legal infirmities of that impact.  *See* Exhibit A (attached hereto).

137.   Plaintiff's representatives presented legislators and Governor Wolf's office with patron data showing the areas from which Hollywood Casino draws its customers and maps, materially similar to the map attached to Exhibit A, depicting the disparate impact that the 25-mile protective zone provision would have on Hollywood Casino.  As noted above, Rep. Rozzi referred to this map on the House

40

floor on the morning of the House vote. This map and information was also included in the white paper circulated in Harrisburg by Plaintiff's representatives—all to no avail.

138. Upon information and belief, during the legislative drafting process, legislators created additional maps showing the creation of "mega cluster" protective zones in the eastern and western corridors of Pennsylvania, which bar development of Category 4 casinos in those portions of the state and leave only central Pennsylvania available for the siting of these 10 new casinos.

139. Despite sufficiently prior and clear awareness that (1) the bill's protective zone provisions created mega clusters which bar development of a Category 4 casino in the most populous areas of the state, (2) the areas that remain available for development of 10 Category 4 casinos are banded in the central portion of the state and are not near the state's population centers, (3) existing casinos receive disparately sized protective zones, with some casinos receiving over three times more protection than others, (4) Mount Airy received a special carveout, with an enhanced buffer zone, and (5) a 25-mile protective zone does little for Hollywood Casino where the majority of its customers travel from beyond 25 miles and the effect of the protective zones is that the remaining sites for development of a Category 4 casino completely surround Hollywood Casino, legislators and Governor Wolf went ahead with passing Act 42, without including

41

any additional measure that might protect Hollywood Casino from cannibalization of its customer base and revenue.  Upon information and belief, legislators and Governor Wolf ignored the harm to Hollywood Casino because they wanted to be able to point to Act 42's speculative revenue projections and say that they had closed the budget gap.

140.   As applied, the protective zone provision singles out Plaintiff's Hollywood Casino as the only existing Pennsylvania casino that does not receive any kind of protection, beyond the inadequate 25-mile radius protective zone, against cannibalization of its gaming revenue.  Further, because of the mega clusters created by the Act's plain language in the eastern and western parts of Pennsylvania, Hollywood Casino is the only Pennsylvania casino that faces the prospect of competing Category 4 casinos swarming its facility from every direction, just beyond the 25-mile protective zone.

141.   Hollywood Casino's disparate and inadequate protective zone will cause significant harm to Plaintiff's business by dramatically reducing Hollywood Casino's customer base and revenue.

142.   Initial gaming revenue modeling suggests that Hollywood Casino will face approximately $34 million in revenue loss each year due to cannibalization.

143. The same modeling suggests that projected cannibalization of Hollywood Casino's revenue is at a level roughly 6.5 times higher than all existing other Category 1 or 2 casinos.

144. As a result of cannibalization, Hollywood Casino will generate less tax revenue for the Commonwealth. This result is contrary to Act 42's purported legislative goals of generating additional tax revenue for the Commonwealth while preserving the revenue stream from existing casino facilities.

145. In addition, Act 42 provides that an existing casino facility may not reduce its allotment of slot machines or table games due to cannibalization by a new Category 4 facility, *see* 4 Pa. C.S. § 1305.1(d)(4), so Plaintiff could be forced to operate its casino at a loss when it is faced with competition from surrounding Category 4 facilities.

146. Auctions for Category 4 facilities will begin January 10, 2018, and end by August 2018, and because the Act provides that the PGCB may authorize winners to open temporary facilities, auction winners may open up one or more Category 4 casinos in close proximity to Hollywood Casino within several months.

147. Plaintiff faces an actual, immediate, and ongoing constitutional injury because the protective zone provision, as applied, intentionally singles Plaintiff out for disparate treatment in violation of the United States and Pennsylvania Constitutions.

148.   The intentional adverse and disparate treatment of Mountainview under Act 42's protective zone provision will cause significant harm to its business at Hollywood Casino in the immediate future.

149.   Mountainview has no adequate remedy at law to secure its constitutional rights should the auctions go forward while the constitutionally illegitimate protective zone provision remains in place.

## SPECIAL TREATMENT OF MOUNT AIRY CASINO

150.   The Act also provides that "a Category 4 slot machine license may not be located in a Sixth Class County which is contiguous to a county that hosts a Category 2 licensed facility."  4 Pa. C.S. § 1305.1(b)(7).

151.   That provision, by its plain language, applies to only a single existing casino in Pennsylvania, Mount Airy Casino Resort in Monroe County, which is a Category 2 casino, and bars Category 4 casinos from being built anywhere in the three Sixth Class Counties that touch Monroe County:  Carbon, Pike, and Wayne counties.  No other existing Category 2 licensed facility is located in a county that is adjacent to one or more Sixth Class Counties.

152.   This amendment gives Mount Airy a protective zone nearly three times larger than the 25-mile radius protective zone granted to every other existing Pennsylvania facility.

153.   These location restrictions guarantee that Mount Airy Casino Resort will remain the closest and most accessible casino in Pennsylvania to those living in the New York City metropolitan area.

154.   The provision favoring Mount Airy was not included in any earlier version of a gambling expansion bill considered by the House or the Senate.

155.   After House Bill 271 was passed by the General Assembly and released to the public, multiple persons, including investigative journalists, began asking questions about which legislator inserted the amendment in favor of Mount Airy and why.

156.   Steve Crawford, president of the lobbying firm that represents Mount Airy, publicly said that many establishments were worried about the gaming expansion bill and had lobbied for larger protective zones.  Mr. Crawford stated that Senate leaders came up with the language that benefited exclusively Mount Airy.  *See* Craig R. McCoy & Angela Couloumbis, *Tucked in Pa. Gaming Bill: A Million-Dollar Clause of Mount Airy Casino*, The Inquirer (Nov. 11, 2017).

157.   Rep. Mark Rozzi, among others, publicly expressed concern about the special protections given to Mount Airy.  Specifically, he stated, "Something smells here.  Why are we giving special treatment to one casino?"

158.   Well after the fact, Sen. Mario Scavello belatedly stepped forward and admitted that he asked Senate leaders drafting the bill to include the Mount Airy protective provision to preserve the financial health of Mount Airy.

159.   The Bill's drafters have provided no explanation for why the financial health of Mount Airy or the other Pennsylvania casinos that enjoy the protective benefits of the mega cluster protective zones warrant protection while the financial health of Plaintiff's Hollywood Casino, which has contributed over $969 million in revenue to the Commonwealth over the past decade, does not.

### HARM TO MOUNTAINVIEW FROM THE MOUNT AIRY SPECIAL PROVISION

160.   Mountainview may participate in the first round of auctions for Category 4 casino locations, which will open on January 10, 2018.  Mountainview holds a Category 1 slot machine license, is in good standing with the PGCB, and can submit a bond or letter of credit for the $7.5 million minimum bid required by Act 42.

161.   Mountainview is evaluating pursuing a Category 4 casino facility in Pennsylvania in the first round of auctions.

162.   One potentially attractive area for the siting of a Category 4 casino is the Matamoras area, where Interstate 84 crosses into Pennsylvania from New York, an area which is easily accessible from the New York City metropolitan

46

region.  Development of a Category 4 casino in this area is excluded by the Act's special treatment of Mount Airy.

163.   Mountainview and other potential bidders will suffer irreparable harm for which it has no adequate remedy at law as a result of the Act's expansive protective zone around Mount Airy should auctions go forward while the special protective provision for Mount Airy casino remains in place.

## CAUSES OF ACTION

### Count I – Violation of Equal Protection Rights under the Fourteenth Amendment to the United States Constitution and the Pennsylvania Constitution

164.   Plaintiff incorporates herein by reference all of the foregoing allegations.

165.   The Fourteenth Amendment to the United States Constitution guarantees all citizens "equal protection of the laws."  It forbids a state government from denying that protection "to any person within its jurisdiction."  U.S. Const. amend. XIV.  At a minimum, it forbids state governments from engaging in intentional and arbitrary discrimination against its citizens.

166.   The Pennsylvania Constitution contains similar equal protection guarantees.  Pa. Const. art. I, § 26 ("Neither the Commonwealth nor any political subdivision thereof shall deny to any person the enjoyment of any civil right, nor discriminate against any person in the exercise of any civil right.").

167.   The equal protection guarantees of both the United States and Pennsylvania Constitutions forbid Defendants from imposing on Plaintiff burdens that are not cast upon others similarly situated.

168.   Plaintiff has been denied equal protection because it, as a "class of one," has been "intentionally treated differently from relevantly similar individuals and there was no rational basis for the difference in treatment." *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000).

169.   Section 1305.1(b)(2) of the Gaming Act impermissibly and intentionally treats Plaintiff differently than all other existing Pennsylvania casino operators, because, as applied, Hollywood Casino is the only Pennsylvania casino that does not enjoy a protective area beyond the 25-mile radius provided on the face of the Act.

170.   As the map below shows, Section 1305.1(b)(2), as applied, provides for overlapping rings granting an approximately 500 square mile block of protection from Category 4 casinos in the eastern third of the state.  Casinos in the southwestern part of the state also enjoy a large area of protection.

171.   Plaintiff constitutes a "class of one" because it is the only Pennsylvania casino facility that faces potential competition as close as 25 miles from its Hollywood Casino.

172.   Further, because the eastern and southwestern mega clusters created by Section 1305.1(b)(2) bar the development of a Category 4 casino in almost all of the eastern and western thirds of the state, the remaining available sites are in the central portion of Pennsylvania, surrounding Hollywood Casino.

173.   Plaintiff is therefore the only existing Pennsylvania casino operator who will face significant cannibalization of its customer base from up to 10 Category 4 casinos.

174.   Legislators and Governor Wolf were well aware of the effects of the overlapping buffer zones in the eastern and southwestern parts of Pennsylvania and the adverse and disparate impact that those protective zones created as to Hollywood Casino, at least in part because representatives received and considered maps circulated by Plaintiff showing the overlapping protective zones and the white paper explaining the locations from which Hollywood Casino draws its customers when a prior proposal of "ancillary" casino legislation was circulating containing the same 25-mile protective zone provision as the provision in Act 42. Still, legislators and Governor Wolf did nothing to revise Act 42 to prevent the adverse, disparate impact on Hollywood Casino.

175.   There is no rational basis related to a legitimate state interest for permitting all other casino operators in Pennsylvania significantly larger protective zones than Plaintiff.

49

176.   Further, there is no rational basis related to a legitimate state interest for almost entirely barring the development of 10 new casino facilities in the most populous portion of the state—namely, the greater Philadelphia, Pittsburgh, Lehigh Valley, and Scranton–Wilkes-Barre markets—and instead requiring that those 10 new casino facilities be almost exclusively confined to the central portion of Pennsylvania, which is much less populated.

177.   To the contrary, affording Plaintiff a smaller protective zone than all other casinos and creating a landscape where the locations available for the new casinos necessarily surround Hollywood Casino, particularly when Hollywood Casino is located in a relatively sparsely populated area of Pennsylvania as compared with other existing Pennsylvania casinos and draws patrons from a larger geographic area within the Commonwealth than all other existing Pennsylvania casinos, directly contradicts the General Assembly's stated purpose for the protective zones and for Act 42 in general:  to protect existing casinos from market cannibalization.  This conduct, particularly given the advance and clear notice of the legal and economic consequences, is arbitrary and capricious.

178.   To the extent the purpose of Act 42 is to create new sources of revenue for the Commonwealth (while at the same time preserving the revenue stream from first-generation casinos), the failure to provide Plaintiff with the same-

sized buffer zone as all other casinos and the ban on siting casinos in the most populous areas in the state defeats any legitimate purpose of the legislation.

## Count II – Violation of the Substantive Due Process Rights Under the Fourteenth Amendment of the United States Constitution and the Pennsylvania Constitution

179.   Plaintiff incorporates herein by reference all of the foregoing allegations.

180.   The Fourteenth Amendment to the United States Constitution prohibits state governments from depriving any person of "life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.

181.   The Pennsylvania Constitution similarly provides that "[a]ll men are born equally free and independent, and have certain inherent and indefeasible rights, among which are those of enjoying and defending life and liberty, of acquiring, possessing and protecting property and reputation, and of pursuing their own happiness."  Pa. Const. art. I, § 1.

182.   Plaintiff's due process rights have been violated because Act 42 gives a "privilege [to] certain businessmen over others" and "is not animated by a legitimate governmental purpose[.]"  *Craigmiles v. Giles*, 312 F.3d 220, 229 (6th Cir. 2002).

51

183. The mega cluster protective zones created by Act 42 provide privileges to every existing Pennsylvania casino other than Plaintiff's Hollywood Casino.

184. The mega cluster protective zones created by Section 1305.1(b)(2) effectively immunize casinos in the eastern and southwestern portions of Pennsylvania from competition by the new Category 4 casinos since virtually no Category 4 casinos can be located in those portions of the state.

185. Mount Airy receives an additional privilege in the form of an enhanced buffer zone that applies exclusively to it and in addition to the 25-mile protective zone afforded to all Pennsylvania casinos.

186. Plaintiff, unlike the casinos located within the eastern and southwestern mega clusters and Mount Airy, receives no privilege of an enlarged buffer zone and will face significant competition from up to 10 new Category 4 casinos, because after application of the mega cluster protective zones, the available sites for the development of Category 4 casinos are almost exclusively in the central portion of Pennsylvania and surround Hollywood Casino.

187. In addition, Plaintiff is the only existing Pennsylvania casino that will receive only 25 miles of protection, in all directions, from the development of a Category 4 casino. The other existing casinos enjoy far greater protections from competition from Category 4 casinos.

188.    These is no legitimate governmental purpose for treating Plaintiff so differently than all other casino operators in Pennsylvania.

### Count III – Violation of Special Legislation Provision of the Pennsylvania Constitution (Plaintiff As A Class of One)

189.    Plaintiff incorporates herein by reference all of the foregoing allegations.

190.    Under the Pennsylvania Constitution, the General Assembly "shall pass no local or special law in any case which has been or can be provided for by general law." Pa. Const. art. III, § 32.

191.    A classification is *per se* unconstitutional "when the class consists of one member and it is impossible or highly unlikely that another can join the class." *Pa. Turnpike Comm'n v. Commonwealth*, 899 A.2d 1085, 1098 (Pa. 2006).

192.    Act 42's protective zone provision creates a *per se* unconstitutional "class of one," because Plaintiff is the only casino in Pennsylvania that is not afforded a protective buffer that encompasses the population centers from which it draws it patrons.

193.    Plaintiff is the only existing Pennsylvania casino afforded a smaller protective zone of just 25 miles in all directions—and a zone that does not encompass its patrons—whereas all other Pennsylvania casinos will be granted much larger protective zones that fairly encompass their primary markets.

194.    Further, given the effect of the mega cluster protective zones created by Act 42 to bar development of a Category 4 casino in roughly the eastern and western thirds of the state, Plaintiff is the only existing casino operator who will face the prospect of up to 10 new casinos in close proximity and in the market from which it draws its patrons.

195.    The class containing Plaintiff and only Plaintiff is a closed class, as it is highly unlikely that another Category 1, 2, or 3 casino will be constructed that falls into this bucket in the future.

## Count IV –Violation of Special Legislation Provision of the Pennsylvania Constitution (Special Treatment of Mount Airy Casino Resort)

196.    Under the Pennsylvania Constitution, the General Assembly "shall pass no local or special law in any case which has been or can be provided for by general law." Pa. Const. art. III, § 32.

197.    The main purpose of Pennsylvania's proscription against special laws is "to put an end to the flood of privileged legislation for particular localities and for private purposes which was common in 1873." *Pa. Turnpike Comm'n*, 899 A.2d at 1094; *Wings Field Pres. Assocs., L.P. v. Com., Dep't of Transp.*, 776 A.2d 311, 316 (Pa. Commw. Ct. 2001) (noting that the purpose of the special legislation provision "was to prevent the General Assembly from creating classifications in order to grant privileges to one person, one company or one county").

54

198.   A classification is *per se* unconstitutional "when the class consists of one member and it is impossible or highly unlikely that another can join the class." *Pa. Turnpike Comm'n*, 899 A.2d at 1098.

199.   Section 1305.1(b)(7) of the Gaming Act provides that "a Category 4 slot machine license may not be located in a Sixth Class County which is contiguous to a county that hosts a Category 2 licensed facility."  4 Pa. C.S. § 1305.1(b)(7).  This provision, by its plain language, applies to only one existing Pennsylvania casino:  Mount Airy Casino Resort.

200.   Section 1305.1(b)(7) provides special, favored treatment to Mount Airy Casino in the form of a larger market protective zone that operates on top of the 25-mile-radius protective zone afforded to other Pennsylvania casinos.

201.   Mountainview is harmed by the special treatment to Mount Airy. Plaintiff, because, like other existing Category 1 and 2 operators, is potentially interested in bidding for the opportunity to develop a Category 4 casino in Carbon, Pike, and Wayne Counties, but is excluded by the Act's special treatment of Mount Airy from pursuing a Category 4 casino at this location.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests asks the Court to enter judgment in its favor and against Defendants and to provide the following relief:

a)       An order declaring the Category 4 license program in Act 42 of 2017, including 4 Pa. C.S. §§ 1305.1 and 1305.2, unconstitutional as applied to Plaintiff insofar as it fails to provide Plaintiff with an adequate protective zone against cannibalization with equivalent effect to the protective zones afforded to casino licensees in the mega clusters in eastern or southwestern Pennsylvania or Mount Airy and thereby discriminates against Plaintiff and/or treats Plaintiff as a class of one in violation of its rights under the United States Constitution and the Pennsylvania Constitution, including its right to equal protection and due process, and the ban on Special Legislation that favors a private party.

b)       An order enjoining Defendants from enforcing or exercising any authority under the Category 4 program in Act 42, including 4 Pa. C.S. §§ 1305.1 and 1305.2;

c)       An order for costs incurred in bringing this action;

d)       An order for reasonable attorneys' fees under 42 U.S.C. § 1988(b); and

e)       Such other and further relief as may be just and proper.

Respectfully submitted,

Date: January 9, 2018

*/s/ Steven E. Bizar*

Steven E. Bizar (Pa. 68316)
Will W. Sachse (Pa. 84097)
William T. McEnroe (Pa. 308821)
Tiffany E. Engsell (Pa. 320711)
Cira Centre
2929 Arch Street
Philadelphia, PA  19104
Tel:  215-994-4000
Fax:  215-994-2222
steven.bizar@dechert.com
will.sachse@dechert.com
william.mcenroe@dechert.com
tiffany.engsell@dechert.com

*Attorneys for Mountainview Thoroughbred Racing Association, LLC*

# Exhibit A

# The Disparate Impact of the Ancillary Casino Proposal on Hollywood Casino at Penn National Race Course

## October 10, 2017

## Penn National Gaming, Inc.

**Carl Sottosanti, Esquire**
**Ex. Vice President & General Counsel**
**Penn National Gaming, Inc.**
**(610) 378-8214 Office**
**(610) 914-0149 Mobile**
**carl.sottosanti@pngaming.com**

**Steven E. Bizar, Esquire**
**Dechert LLP**
**(215) 994-2205 Office**
**(267) 275-1268 Mobile**
**steven.bizar@dechert.com**

**Eric Schippers**
**Sr. Vice President, Public Affairs**
**Penn National Gaming, Inc.**
**(610) 378-8321 Office**
**(484) 769-4127 Mobile**
**eric.schippers @pngaming.com**

**Adrian R. King, Jr., Esquire**
**Ballard Spahr LLP**
**(215) 864-8622 Office**
**(215) 990-4787 Mobile**
**kinga@ballardspahr.com**

### The Disparate Impact of the Ancillary Casino Proposal on Hollywood Casino at Penn National Race Course

Pennsylvania's 12 existing casinos consistently generate more than $1.4 billion per year in tax revenue for the Commonwealth and host communities.[1] An "ancillary casino" bill authorizing up to 10 new ancillary casinos would not only threaten the viability of all of those existing casinos and their many stakeholders, it would in particular have a disproportionately negative impact on Hollywood Casino ("Hollywood"). Hollywood, which is located in Central Pennsylvania in the community of Grantville, Dauphin County, has been home to the Penn National Race Course thoroughbred racetrack since 1972.

The proposed legislation is motivated by a flawed hope that more casinos mean more revenue for the Commonwealth, which would be used to help close a reported $2.2 billion budget gap. The reality is that ancillary casinos are certain to take business from existing casinos and are not likely to increase overall gambling revenue by attracting new gamblers. The sponsors are aware of this "cannibalization" concern, and the legislation's proposed solution is a "buffer zone" that would bar ancillary casinos from opening within a 25-mile radius of an existing casino. Not only does this not fix the problem, it makes things far worse for Hollywood. As the only existing casino in the heart of Pennsylvania, more than two-thirds of Hollywood's customers come from beyond the 25-mile buffer. Other existing casinos in the more densely populated eastern and western corridors gain far more protection from the aggregate "Mega-Cluster" of buffer zones that overlap to block new casinos in much wider and more populous areas. These overlaps effectively extend the buffer zones to as large as *127 miles by 76 miles* in the east and *95 miles by 72 miles* in the west – largely shielding these casinos from the impact of cannibalization and limiting the potential locations for new ancillary casinos to areas within the

---

[1] See Pennsylvania Gaming Control Board 2016-2017 Annual Report, pg. 18.

1

proven Hollywood customer market zone.  Should this legislation pass, Hollywood, unlike other casinos, will  face significant economic harm that could threaten its 1,000-plus employees, as well as other local businesses and the horse racing industry that rely on the economic activity generated by the casino.[2]  This discrimination against Hollywood is not just bad economics and bad policy:  It is against the law.

## I.    The Proposed Bill Discriminates Against Hollywood In Violation of the United States and Pennsylvania Constitutions

The Commonwealth's laws must give equal protection to all similarly-situated people or entities.  This is the fundamental principle of the United States Constitution's Equal Protection Clause (14th Amendment), and the Pennsylvania Constitution's Special Laws Clause (Article 3, Section 32).  These protections extend to Hollywood Casino just as they do to any individual.

The proposed legislation violates these bedrock principles.  Specifically, the proposed legislation has the effect of singling out and negatively impacting a "class of one"—Hollywood. If enacted, this ancillary casino legislation would violate the United States and Pennsylvania Constitutions.  *Village of Willowbrook v. Olech*, 528 U.S. 562 (2000); *Pa. Turnpike Comm'n v. Commonwealth*, 899 A.2d 1085, 1094 (Pa. 2006).

---

[2] For example, in 2016 the 12 casinos in the state generated $243 million for the Racehorse Development Fund ("RHDF") which, among other things, provides funds to promote breeding of thoroughbred and standardbred racehorses in the state, and supports agricultural fairs throughout the Commonwealth (From Pennsylvania Gaming Control Board 2016-2017 Annual Report).  The economic output of the RHDF was estimated at $389 million in 2016 (Joint State Government Commission Report: "Horse Racing in Pennsylvania," February 2017).  In addition, the Pennsylvania horse racing industry supports over 23,000 jobs (see http://www.pahbpa.com/what-we-do/news/pennsylvania-race-horse-development-fund-fact-sheet/) and 18% of the total acres that are agriculturally preserved in the state are equine related.

2

The legislation's proponents may not have intended this discriminatory effect. And some may even attempt to defend the proposed bill as "fair" or "equal" because the 25-mile buffer zone applies equally to all twelve existing casinos. But it is not enough for a law to be neutral on its face; a law can violate the Constitutions if that law has a discriminatory effect. Indeed, continuing to press this bill in its current form, after learning of the disproportionate harm it will cause Hollywood, supports the conclusion that the harmful effect of the bill is intended, or at a minimum, willfully ignored.

Hollywood is the only existing casino in Pennsylvania that does not get adequate protection from the buffer zones as drawn. Attached as Figure 1 is a map showing the true protective effect of those zones. Overlapping rings in the Philadelphia, Lehigh Valley, and Scranton-Wilkes-Barre areas create a Mega-Cluster that has the practical effect of extending protection to the seven existing eastern casinos far beyond the 25-mile radius contemplated in the proposed bill. The same is true in the western part of the state, where three existing casinos form another protective Mega-Cluster.

By contrast, Hollywood is: 1) the only casino that will have a buffer of only 25-miles in all directions; 2) the only casino where the majority of its patrons fall outside of the buffer zone; and 3) the casino whose current existing business is most likely to be lost to new ancillary casinos in the secondary markets such as Reading, Lancaster, York, and Gettysburg, all of which are closer to Hollywood than to any other casino as well as areas from which Hollywood draws a large number of its patrons.[3] Hollywood is isolated in the heart of Pennsylvania, and does not enjoy the benefits of an expanded protective zone like the eastern and western existing casinos. Exacerbating the impact, the majority of Hollywood's patrons reside beyond its 25-mile buffer

---

[3] Charles Thompson, *"Lawmakers mull opening 'satellite casinos' in an attempt to balance the state budget,"* PennLive.com (July 20, 2017) (Attachment "A").

3

zone, which encompasses a mostly rural area. By contrast, the Mega-Clusters' overlapping exclusivity zones, which cover the most densely populated areas of the state, contain the majority of those existing casinos' customers. In short, Hollywood is the only casino facing 360 degrees of cannibalization from proposed ancillary casinos.[4]

There is no rational basis for permitting the eastern and western Mega-Clusters significantly larger protective zones than Hollywood. Indeed, this disproportionate treatment directly contravenes the stated purpose of the buffer zones: to protect existing casinos from market cannibalization, and is therefore arbitrary, capricious, and not rational. The proposal also fails to further any revenue-generating goals, since the ancillary casinos will succeed only at the expense of the $1.4 billion revenue stream from existing casinos—most notably and disproportionately, by cannibalizing Hollywood's existing customers and revenues.

Recent history demonstrates that proximity to new casinos does not attract additional gamblers into the market. In fact, it may have the opposite effect. A 2012 study found evidence that in the Southeastern Pennsylvania-Atlantic City-Delaware Park market, the impact of new Pennsylvania casinos reduced overall gambling revenue in the region.[5] In other words, adding new ancillary casinos near existing ones not only cannibalizes the existing casinos' revenues, it may also reduce the total amount of revenue generated by the old and new casinos combined and, alarmingly, could in the end lead to the casino closings and loss of employment that have

---

[4] Presque Isle Downs is the only other casino outside a Mega-Cluster, but it borders Ohio and New York, and likely draws a significant number of patrons from those states. More importantly, Presque Isle is shielded from ancillary casino competition along its northern, western and eastern sides by Lake Erie, Ohio and New York respectively.

[5] Condliffe, S. (2012). Pennsylvania Casinos' Cannibalization of Regional Gambling Revenues. *UNLV Gaming Research & Review Journal, 16*(1), 45-58 ("there is evidence that, as a region, gambling may fall as a result of overexpansion in the marketplace"). Retrieved from http://digitalscholarship.unlv.edu/grrj/vol16/iss1/3.

4

plagued Atlantic City over the last decade. At a minimum, it would be reckless and ill-advised to add additional ancillary casinos before the Commonwealth can fully evaluate the impact of the two unopened casinos already planned in Pennsylvania (i.e. Stadium Casino in Philadelphia and the yet to be issued Category 1 Slots License that includes a harness racing track), as well as the recently opened casinos in three adjacent states.

This proposed bill should not pass in its current form. It has the effect of singling out and discriminating against a Pennsylvania business with no rational basis, in violation of the United States and Pennsylvania Constitutions.

## II. The Proposed Bill Substantially Impairs Hollywood's Contracts With Business Partners in Pennsylvania and Elsewhere

The Commonwealth also may not pass a law that retroactively impairs Hollywood's contract rights. This is a fairness principle memorialized in the Contracts Clauses of the United States and Pennsylvania Constitutions. In essence, it assures that the Commonwealth does not change the business playing field after the fact in a way that harms existing contractual relationships, unless there is a legitimate and significant public reason to do so. U.S. Constitution Art. I, § 10; Pa. Constitution Article I, § 17. There is no good reason here.

Hollywood, as well as its Pennsylvania-based parent company, Penn National Gaming, have an ongoing relationship with the more than 1,000 Pennsylvanians they employ, as well as extensive existing contracts with local, regional, and national vendors, entertainers, and small businesses, as well as with the horse racing community. Many of these contracts directly relate to and support the ongoing operation of the Hollywood facility in Grantville.

There can be no doubt that the proposed bill would substantially impair these contractual relationships. Any legislation that causes Hollywood to lose a substantial portion of its patrons and revenue will also necessarily substantially impair Hollywood's existing contracts. Penn

5

National has invested over $350 million in its Grantville casino.  Hollywood contracted with maintenance workers and businesses to maintain the property, with entertainers and vendors to attract customers, and with many other participants in the horse racing industry.  By inviting ancillary casinos into the very locations from which Hollywood draws its patrons, the legislation would impair Hollywood's ability to maintain its contracts with the high quality businesses, vendors, horsemen, and other Pennsylvanians the company relies on to run a successful casino.

Supporters of the bill may believe it is a necessary evil intended to address the budget gap, even if it has the follow-on effect of damaging or diminishing Hollywood's existing contractual relationships.  But again, while that may be a legitimate purpose in theory, in reality the bill will not remedy the budget deficit problem given how the ancillary casino concept is presently structured.  The loss of Hollywood market share to ancillary casinos is revenue transfer, not revenue generation.  And what of the detailed market study to determine the optimal protective zones, which had been contemplated in earlier versions of the bill?[6] Absent such a study, and a rigorous approach to siting that takes into account *all* existing casinos' competitive situations, this bill cannot be defended as rationally justified to further a legitimate economic interest.  Rather, it substantially impairs Constitutionally-guaranteed economic rights, and should not be enacted as currently proposed.

## III.    The Proposed Bill is Both Risky and Economically Irrational

The General Assembly may believe it is playing with house money when it comes to changes in gambling policy affecting the $1.4 billion that flows through the Commonwealth's coffers each year from casino revenue.  That is not so.  Competition from other casinos in the Mid-Atlantic region is fierce.  Staying competitive requires large and ongoing investments in

---

[6] Thompson, *"Lawmakers mull opening 'satellite casinos' in an attempt to balance the state budget"* (Attachment "A").

6

property, personnel and marketing.  Penn National Gaming has already invested over $350 million in its Hollywood Casino.  For continued investment to be economically justifiable to the company's shareholders, Penn National needs to know the Commonwealth does not plan to invite competitors onto Hollywood's doorstep and single it out for unfair treatment.

Pennsylvania's 12 existing state-of-the-art casinos are more than capable of satisfying the demand for casino gambling in the Commonwealth.  In addition, due to Pennsylvania's gaming tax rate, no state received more direct gaming tax revenue from its casinos than Pennsylvania.[7] Rather than generating additional revenue from new casino gambling activity or attracting gamblers from across state lines, the proposed ancillary facilities will instead create new casinos that will merely cannibalize the existing customers at Pennsylvania's existing casinos—in particular, one casino in the heart of the Commonwealth—without generating additional bottom-line revenue.  Robbing Peter to pay Paul may be a good idea when Peter is in Atlantic City and Paul is in Pennsylvania, but it certainly doesn't make economic sense when Peter is an established tax-generating business employing 1,000-plus Pennsylvania residents in the heart of the Commonwealth.

---

[7]   American Gaming Association Report: "2016 State of the States." <u>See</u> https://www.americangaming.org/research/reports/2016-state-states

# Figure 1



25 Mile Exclusion Zones

# Attachment "A"



# Lawmakers mull opening 'satellite casinos' in an attempt to balance the state budget

Updated on July 20, 2017 at 6:48 AM Posted on July 20, 2017 at 6:02 AM

**By Charles Thompson**

cthompson@pennlive.com

Pennsylvania may be on the verge of becoming a national gambling guinea pig.

To help balance the still-unfinished, $32 billion state budget, lawmakers have proposed establishment of up to 10 new "satellite" casinos to be scattered around Pennsylvania.

Are you all ready for intentionally small casinos in places like Reading? York County? State College? Altoona? The Lake Erie shoreline?

Like it or not, it is becoming a central plank of the gambling expansion piece of the budget puzzle, along with the authorization of Internet-based games played from personal electronic devices, and it is a bit of a gamble in itself.

For while many other states have added small numbers of casino licenses over time, "this would be the first time it (creation of new sites) was done in just this way," said Michael Soll, president of The Innovation

Group, a New Orleans-based gambling industry consultant that has conducted several studies of Pennsylvania's market.

And then, there's this:

The main motivator in the ongoing push to develop satellite casinos or, in the alternative, permit slots-style Video Gaming Terminals in bars, restaurants and private clubs is more money for the state budget.

Many industry experts are concerned that by making long-term changes to solve a present budget issue, Pennsylvania risks hurting a casino industry that, at present, consistently generates more than $1.4 billion per year for the state, host communities and school property taxpayers.

"The worst reason to expand gambling is to solve this year's budget shortfall," Michael Pollock, managing director of the New Jersey-based Spectrum Gaming Group, said in a telephone interview this week.

"Any type of move like this you've really got to go slow and take your time. You've got to ask the right questions and then get satisfactory answers because, moves like this, you really can't undo them."

So far, it seems to be a trade-off many lawmakers are willing to make.

As Rep. Stephen Bloom, a Carlisle Republican, put it in a recent interview with The Associated Press, "I hate it (voting for expanded gambling). I just hate it less than taxes."

As an example of the unintended consequences of this latest state-sanctioned casino gold rush, consider the case of the casino that sits closest to the Capitol dome, Hollywood Casino at Penn National Race Course.

It's not clear yet how the licenses for the individual satellite sites will be awarded: Some form of auction is being considered, with a minimum bid of $10 million, but no drafts of the proposal have yet hit the streets.

But sources familiar with drafting discussions have noted for the past several weeks that central to the plan is creation of a market protection

Page | 2

zone around each of the first-generation casinos built and opened over the last decade.

The lead version, at this point, is a 25-mile radius around each casino.

The idea is that for the satellite casinos to be true revenue generators for Pennsylvania, cannibalization of the state's 12 existing commercial casinos should be held to a minimum.

But the way the 25-mile plan plays out on the state map has Wyomissing-based Penn National Gaming executives tossing in their sleep.

Overlapping rings in the Philadelphia, the Lehigh Valley and into the Scranton Wilkes-Barre regions mean there literally could not be any of the new casinos built in a roughly 500-square-mile block in the eastern third of the state.

But many of the most attractive secondary markets that are left - Reading, Lancaster, York, Gettysburg, State College, even Williamsport - are all closer to Penn National than anywhere else.

"The vast majority of the potential sites for these new casinos fall within our market area in Central Pennsylvania, representing a severe threat to our property and the more than 1,050 jobs it represents," Eric Schippers, Penn National's senior vice president for public affairs said in a recent statement to PennLive.

"We're beyond disappointed and will do everything in our power to fight to protect our employees' jobs."

Compounding the problem, Penn National execs argue, is that the 25-mile circle around its Grantville racetrack casino captures large swatches of rural ground like Upper Dauphin and Perry counties. The company contends that more than half its customers lie outside its 25-mile buffer.

Early versions of the bill, according to sources, would have required a market study of the state before any new casino licenses were awarded, in order to overlay the satellite shops to best fit with the existing market.

Page | 3

That language has apparently been struck from later drafts in an effort to help get more casino licenses issued more quickly, because the state budget calculus demands it.

Some casino allies express sympathy for Penn National in this debate, but others see a little irony: Penn National, they note, was the one operator that was open to VGTs, seen by the industry as a whole as a sure-fire way to erode the base market.

The exclusion zone issue is one of several final details that are still on the table, and it's possible there will be further changes, like giving casinos a right to match any bid to build casinos close to their natural market areas.

But it's a good example of why it's hard to do gambling policy in the vise of a budget crunch.

There is more consensus around the introduction of Internet-based games, the other major plank of the emerging Pennsylvania legislation.

I-gaming has already been deployed in another major casino states, New Jersey, and has at this point proven itself to be a net plus to the existing brick-and-morter casinos.

"The data we've analyzed demonstrates that the participating casinos are able to attract a different demographic on-line, and they've been able to cultivate some of them as customers who will later visit the land-based casinos," said Spectrum's Pollock.

In addition, a 2014 study by Philadelphia-based Econsult Solutions found that the introduction of I-gaming in Pennsylvania could in fact be a good thing for the established market here.

There is some evidence to suggest the satellite casino plan can work too, for the state as a whole.

In a 2011 study for then-Treasurer Rob McCord, Soll's firm identified three sites in eastern and central Pennsylvania that could generate more net revenue than a second Philadelphia site: southern York County; Reading; and Chambersburg.

Page | 4

It also said a casino in the Altoona area would nearly match the revenue from a second Philadelphia casino.

That report assumed the current construct of a $50 million license fee. Presumably, those and other sites would be just as attractive with less up-front cost, as the bill envisions.

Proponents argue that the satellites will give the state's existing casino players a chance to bolster their in-state markets and, hopefully, create hundreds of new jobs along the way.

Then too, there's the political bounty of creating a new form of local revenue in 10 more communities through a host municipality local share.

Stephen Mullin, a principal with Econsult who conducted the state's first i-gaming study, said he rates it as "very, very likely" that casino operators can find enough secondary markets to grow the state's net revenue.

Roger Gros, the publisher of Global Gaming Business magazine, agreed, with a caveat.

At some point, Gros said Wednesday, casino operators need to have stability. The changes already being considered in Pennsylvania, he noted, have led to an exploration of a sale - since dropped - by Las Vegas Sands of its Bethlehem site.

"If you continue to manipulate the gaming laws, you're going to get secondary companies that don't really have a commitment to the state and aren't going to reinvest in their properties," Gros said.

"I would encourage the Legislature to say: 'This is going to be the final state of gaming in Pennsylvania.' If these corporations can't count on that, they're not going to stay in your market."

www.pennlive.com/politics/index.ssf/2017/07/why_does_pennsylvanias_gamblin.html

Page | 5